**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| TAMARIN LINDENBERG, | : | |
| | : | **Civil Action No. 14-833 (SRC)** |
| Plaintiff, | : | |
| | : | |
| v. | : | **OPINION** |
| | : | |
| ARRAYIT CORPORATION, ARRAYIT DIAGNOSTICS, INC., AVANT DIAGNOSTICS, INC., JOHN HOWELL, STEVEN SCOTT, and GREGG LINN, | : | |
| Defendants. | : | |

**CHESLER**, District Judge

This matter comes before the Court upon the motion for summary judgment filed by Defendants Arrayit Diagnostics, Inc. ("AD"), Avant Diagnostics, Inc.,[1] Steven Scott, and Gregg Linn (together, "Defendants"), pursuant to Federal Rule of Civil Procedure 56 [Docket No. 59]. Plaintiff Tamarin Lindenberg ("Plaintiff" or "Lindenberg") has opposed the motion and cross-moved for summary judgment [Docket No. 62]. The Court has considered the papers filed by the parties. For the reasons that follow, the court will grant in part and deny in part Defendants' motion. The Court will deny Plaintiff's cross-motion.

---

[1] Arrayit Diagnostics, Inc. changed its name to Avant Diagnostics, Inc. At all times relevant to this suit, the corporate entity operated under the name of Arrayit Diagnostics and will thus be referred to as Arrayit Diagnostics in this Opinion.

## I.    BACKGROUND

This litigation arises out of the termination of Lindenberg's employment by Defendant AD, allegedly because Lindenberg fought to correct a materially misleading Form S-1 that AD filed with the Securities and Exchange Commission ("SEC").  AD is a medical technology company focused on developing diagnostic tests for early cancer detection.  At the time relevant to this litigation, AD held intellectual property rights to Wayne State University patents for OvaDx, an early detection screen for ovarian cancer.  (*See* Linn Aff. ¶ 2.)  AD's goal was, and continues to be, to raise capital in order to secure FDA approval and bring OvaDx to market.  (*Id.*; Pl.'s Dep. 20:5-6.)  In February 2012, AD hired Lindenberg, an ovarian cancer survivor, for a three-year term as an executive consultant to promote the company and test.  (Linn Aff. Ex. F; DiChiara Decl. Ex. 5; Pl.'s Dep. 138:14-17.)

Lindenberg alleges that she met with John Howell, AD's then-CEO and President, as well as financial, legal, and industry advisors to develop a plan to optimize the commercialization of the test.  (Pl.'s Dep. 138:22-139:23; Bosin Cert. Ex. 5.)  After extensive deliberations, a decision was made to isolate OvaDx in a newly formed company, YarraDx, Inc. ("Yarra"), which would focus on this venture.  (Pl.'s Dep. 93:5-94:8; Bosin Cert. Ex. 5.)  As memorialized in a June 15, 2012, term sheet, AD agreed to transfer its intellectual property rights associated with the Wayne State University patents to Yarra in exchange for approximately 32 million shares of Yarra common stock (AD obtained one share of Yarra common stock for each issued and outstanding share of AD common stock).  (Linn Aff. Ex. E.)  AD also received anti-dilution rights with a floor of twenty percent of issued Yarra common shares.  *Id.*  Lindenberg became Yarra's CEO, but was to remain employed by AD pending the implementation of the transfer.  (*Id.*; Am. Compl. ¶ 33; Pl.'s Dep. 77:16-23.)  Howell, AD's sole board member and holder of preferred stock carrying

2

supermajority voting rights, approved the deal.  (Pl.'s SUF ¶ 5; DiChiara Decl. Ex. 12; Am. Compl. ¶ 25.)

Meanwhile, AD also sought to become a public company, and thus filed a registration statement with the SEC in November, 2012.  (DiChiara Decl. Ex. 12.)  Lindenberg alleges that the Form S-1 contained false information because it inaccurately described the Yarra agreement and misrepresented AD's financial obligations.  The Form S-1 described the Yarra deal as a partial transfer of intellectual property related to the Wayne State University patents, which would allow AD to focus its resources on the development of diagnostics for prostate cancer, "a much larger market."  *Id.*  Although Lindenberg recalls being told by Howell that the technology covered by the patents could also be used to create a test for prostate cancer, she noted that the term sheet for the deal delineated a complete transfer of all intellectual property related to the patents to Yarra. Thus, Lindenberg believed that AD could not create a test for prostate cancer, as indicated in the registration statement, because the necessary patent rights were no longer within AD's possession. (Pl.'s Dep. 25:15-26:1, 41:14-42:2, 110:4-111:4.)  Lindenberg also alleges that the S-1 understated AD's liabilities by failing to disclose Lindenberg's deferred compensation and the taxes due on her salary.  (Pl.'s Dep. 68:13-21.)  Lindenberg's employment agreement provided that her compensation would accrue but will not be paid until the company had raised at least $500,000 in capital.  (Linn Aff. Ex. F.)  AD was also required to withhold all customary taxes, which it allegedly failed to do.  (*Id.*; Am. Compl. ¶ 31.)

Lindenberg reports making numerous attempts to correct the S-1.  Initially, she addressed the issue with Howell, but he refused to amend the filing.  (Pl.'s Dep. 66:8-18, 109:19-110:2.)  For reasons undisclosed in the parties' submissions, Howell resigned on December 12, 2012.  On December 16, 2012, Defendant Steven Scott assumed the role of AD's new CEO and Defendant

3

Gregg Linn became the company's President.  (Linn Aff. ¶ 6.)  Lindenberg testified that she attempted to alert the new officers to the problem, but her communications were avoided.  (Pl.'s Dep. 31:4-32:23, 65:3-6, 76:1-77:1.)  Failing to resolve the question within AD, Linn requested a meeting with Rene Schena, the CEO of AD's parent company, AC.  (Pl.'s Dep. 32:21-25.)  The conversation allegedly took place on December 17th and 18th, after which, Schena purportedly told Lindenberg that she would immediately notify Scott.  (Pl.'s Dep. 33:1-3, 65:19-25.)  On December 19, 2012, Scott contacted Lindenberg, but not about the S-1.  Instead, Scott sent her a termination notice.  (Linn Aff. Ex. A.)  On December 20th, AD withdrew the S-1.  (Linn Aff. Ex. D.)  Lindenberg insists that AD terminated her employment because she complained about the filing.

Defendants dispute Lindenberg's version of events.  Most importantly, Defendants deny that Scott or Linn ever learned about inaccuracies in the registration statement from Lindenberg, directly, or through Schena, and note that they independently decided to withdraw the S-1 on December 17, 2012, before Lindenberg spoke about it with Schena.  (Linn Aff. ¶¶ 4, 12, 14; *Id.* Ex. C.)  Defendants paint the Yarra deal as deceitful, and aver that they discharged Lindenberg because she attempted to defraud the company by transferring AD's intellectual property to Yarra for allegedly worthless compensation in Yarra stock.  (Linn Aff. ¶¶ 16-17; Defs.' SUF ¶ 11.)

On March 25, 2014, Lindenberg filed an Amended Complaint against AD, Avant Diagnostics, Inc., AC, and individual defendants John Howell, Gregg Linn, and Steven Scott, asserting the following state law claims against all Defendants: retaliatory termination in violation of the Conscientious Employee Protection Act ("CEPA"); breach of contract; breach of the implied covenant of good faith and fair dealing; economic duress; and intentional infliction of emotional distress.  Lindenberg also brought a claim against AC for tortious interference with her employment agreement.  Defendant AD counterclaimed for two counts of breach of contract.

By Order dated August 6, 2014 [Docket No. 47], in response to a motion to dismiss filed by AC for failure to state a claim, and a motion to dismiss by John Howell, for lack of personal jurisdiction, this Court dismissed Plaintiff's claims as to those Defendants.  The remaining Defendants now move for summary judgment on Lindenberg's claims.  Plaintiff opposes the motion and cross-moves for summary judgment on her breach of contract claim and AD's counterclaims.

II.     **DISCUSSION**

A. **Legal Standard for Summary Judgment**

Federal Rule of Civil Procedure 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (construing the similarly worded Rule 56(c), predecessor to the current summary judgment standard set forth in Rule 56(a)).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  "When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991)).  In considering a

motion for summary judgment, a district court "must view the evidence 'in the light most favorable to the opposing party.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).  It may not make credibility determinations or engage in any weighing of the evidence.  *Anderson*, 477 U.S. at 255; *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (holding same).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish the existence of a genuine issue as to a material fact.  *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985).  "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." *Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001), overruled on other grounds by *Ray Haluch Gravel Co. v. Cent. Pension Fund of the Int'l Union of Operating Eng'rs and Participating Emp'rs*, 134 S.Ct. 773 (2014).  However, the party opposing the motion for summary judgment cannot rest on mere allegations; instead, it must present actual evidence that creates a genuine issue as to a material fact for trial.  *Anderson*, 477 U.S. at 248; *see also Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990) (holding that "unsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment").

**B. CEPA**

CEPA is New Jersey's "whistle-blower" statute.  *N.J.S.A.* 34:19–1 *et seq.*  It protects employees from retaliation by an employer for reporting, threatening to disclose, or refusing to participate in the employer's unlawful activity.  *N.J.S.A.* 34:19–3; *D'Annunzio v. Prudential Ins. Co. of Am.*, 927 A.2d 113, 119 (N.J. 2007).  In relevant part, the statute provides that:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:

> a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer . . . that the employee reasonably believes is in violation of a law, or a rule or regulation promulgated pursuant to law[;] . . . or
>
> c. Objects to or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law[;] ... [or]
>
> (2) is fraudulent or criminal[.]

*N.J.S.A.* 34:19–3.

To support a CEPA claim, Plaintiff must establish that (1) she reasonably believed that her employer's conduct violated either a law or a rule or regulation promulgated pursuant to law; (2) she performed a whistle-blowing activity described in N.J.S.A. 34:19–3a, c(1), or c(2); (3) an adverse employment action was taken against her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action. *Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 92 (3d Cir. 1999) (quoting *Kolb v. Burns*, 727 A.2d 525, 530-31 (N.J. Super. Ct. App. Div. 1999)).

In their motion for summary judgment, Defendants argue that Lindenberg has no evidence to substantiate her CEPA claim. According to Defendants, Lindenberg cannot show that she performed a whistle-blowing activity; if she did, there was no illegal conduct for her to report; and no causal connection exists between Lindenberg's objections to the S-1 and termination, because she was appropriately discharged for cause. The Court finds that Lindenberg has raised sufficient issues of fact to maintain her claim.

### a. Whistle-blowing activity

Defendants insist that Lindenberg never blew the whistle for the purposes of CEPA because she never complained about the S-1 to Scott or Linn, AD's CEO and President, respectively, who succeeded Howell and fired Plaintiff.  However, even if Lindenberg did not communicate the issue to Scott or Linn directly, (Lindenberg reports that she spoke about the Yarra deal with Scott, although the record is not clear about the substance of those conversations, and whether the subject of the Form S-1 specifically was ever discussed), there is a question of fact as to whether Lindenberg's criticisms reached AD's executives by way of Rene Schena, the CEO of AD's parent company, AC. [2]  Lindenberg testified that she met with Schena to voice her concerns about the S-1 on December 17th and 18th.  (Pl.'s Dep. 32:21-25, 65:19-66:21.)  After the meeting, Schena allegedly expressed her intent to immediately relay the information to Steven Scott.  (Pl.'s Dep. 33:1-3.)  Scott contacted Lindenberg just two days later.  However, instead of continuing the conversation about the S-1, Scott informed Lindenberg of her termination.  (Linn Aff. Ex. A.)  On December 20, 2012, three days after the meeting, AD withdrew the S-1.  (*Id.* Ex. D.)  Based on the foregoing record, there is adequate evidence to create an issue of material fact as to the sufficiency of Lindenberg's whistle-blowing activity.

Defendants dispute the truthfulness of Lindenberg's testimony about her meeting with Schena, or whether that meeting had any impact on their decision to withdraw the S-1.  These objections, however, are not appropriately addressed at this time.  The Court's sole role at summary

---

[2] In support of her opposition to Defendants' motion for summary judgment, Lindenberg relies primarily on her own deposition testimony.  Defendants' challenge to this form of evidence is misplaced.  Although Defendants are correct that Plaintiff must support her argument with admissible evidence, evidence introduced at the summary judgment stage does not have to be produced in a form that would be admissible at trial. *Celotex*, 477 U.S. at 327.  "[D]eposition testimony opposing summary judgment may be considered if the out-of-court declarant could later present that evidence through direct testimony, *i.e.* 'in a form that would be admissible at trial.'" *Williams v. West Chester*, 891 F.2d 458, 466 n.12 (3d Cir. 1989).  Lindenberg can certainly do so as to her own testimony.

judgement is to determine whether the non-moving party has presented enough evidence to raise a genuine dispute of material fact; the Court may not make credibility determinations or engage in any weighing of the evidence in resolving the issue. *Anderson*, 477 U.S. at 255.

### b. Defendants' illegal conduct

Defendants next argue that there was no illegal conduct for Plaintiff to expose because they withdrew the S-1 before it became effective; any misstatements were thus not unlawful under the Securities Act of 1933 because no securities were ever sold pursuant to the allegedly fraudulent registration statement. CEPA, however, does not require the plaintiff to demonstrate that the activity complained of constituted an actual violation of a law or regulation, instead, plaintiff must "set forth facts that would support an objectively reasonable belief that a violation has occurred." *Dzwonar v. McDevitt*, 828 A.2d 893, 901-02 (N.J. 2003). The misstatements and omissions highlighted by Lindenberg are reasonably within the ambit of material misrepresentations that may have been actionable under the 1933 Act had the S-1 not been withdrawn.

The S-1 described the Yarra deal as "a definitive agreement to transfer a portion of the intellectual property related to the [Wayne State University] patent," in order to allow AD to "apply [its] resources to the development of prostate cancer [tests], a much larger market." (DiChiara Decl. Ex. 12.) Lindenberg averred that this statement is false because the deal entailed a transfer of *all* intellectual property related to the Wayne State University patents to Yarra; thus the assets that AD intended to monetize were not within its possession. (Pl.'s Dep. 25:15-26:1, 41:14-42:2, 110:4-111:4.) On these facts, AD's characterization of the transfer could have been materially misleading, and a reasonable jury could thus conclude from Lindenberg's testimony that Lindenberg held an objectively reasonable belief that a violation has occurred.

9

The Court also finds reasonable Lindenberg's position that the failure to disclose accrued executive compensation as a liability can constitute a material misrepresentation.  (*See* Pl.'s Dep. 33:23-34:5, 68:13-21.)  Defendants' claim to the contrary appears to argue that the S-1 was accurate upon Lindenberg's termination because Defendants no longer owed Lindenberg her deferred salary.  To reach that conclusion, Defendants disregard the fact that their liability ostensibly existed when the S-1 was filed and the complaint was made, and instead attempt to examine their obligations prior to discharge in light of subsequent events that they themselves engendered.  Even if Defendants were correct in their conclusion that their contractual liability for Lindenberg's deferred salary evaporated upon termination, Defendants cannot absolve themselves of CEPA liability by actions which, if Plaintiff succeeds in proving her claim, would contravene CEPA.

AD's withdrawal of the S-1 is of no consequence.  An employee's rights under CEPA do not turn on the employer's decision to act on the complaint.  *See Mazza v. George Yelland, Inc.*, 161 F. Supp. 2d 376, 379-80 (D. N.J. 2001).  A holding to the contrary would deny protection to employees whose conduct may have prevented the violation of a law in the first place, and would negate the purpose of the statutory scheme.  *See Higgins v. Pascack Valley Hosp.,* 730 A.2d 327, 336 (N.J. 1999) (quoting *Mehlman v. Mobil Oil Corp.,* 707 A.2d 1000 (N.J. 1998)).

### c.  Nexus between whistle-blowing activity and termination

Finally, Lindenberg must show that she was discharged because of her engagement in protected conduct.  *Lippman v. Ethicon, Inc.*, 119 A.3d 215, 226 (N.J. 2015).  The timeline of events – a mere two day gap between Lindenberg's meeting with Schena and her termination – creates a strong inference of causation.  *See Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989).  Although Defendants proffer a legitimate reason for discharge – Lindenberg's involvement with

the Yarra transaction, which allegedly deprived AD of its only valuable asset, the license to the

OvaDx test – their explanation cannot be presently credited because the record of the Yarra deal

is undeveloped, and does not explain how the decision was made, what value was exchanged, and

what role Lindenberg played, especially in light of the fact that it was Howell who approved the

transfer, and was unilaterally authorized to do so as the holder of supermajority voting rights in

AD.  (Pl.'s Dep. 93:5-25, 112:2-10, 134:18-135:8.)  Accordingly, Lindenberg has succeeded in

adducing enough evidence in favor of her CEPA claim to raise genuine issues of material fact.

Defendants' motion for summary judgment will thus be denied.

### C.  Breach of Contract

All parties move for summary judgment on Lindenberg's breach of contract claim alleging

wrongful termination and failure to provide deferred compensation and other contractual benefits.

Defendants argue that they properly terminated Lindenberg's contract because of her involvement

with Yarra to the detriment of AD.  Defendants also claim that, regardless of the reason for

discharge, AD has no liability for Plaintiff's deferred compensation because the conditions

triggering AD's obligation to pay have not been satisfied.  The Court will deny both motions,

except that the Court will grant the motion for summary judgment of individual Defendants, Scott

and Linn, who did not enter into an employment agreement with Plaintiff in their individual

capacities.

The cause for Plaintiff's termination, in one form or another, touches on the transfer of

AD's intellectual property, including the OvaDx license, to Yarra.  The record explaining the Yarra

deal, however, is inadequately developed, which precludes the Court from making a summary

judgment decision about the parties' contractual rights at this time.

Turning to the question of damages, Defendants argue that Lindenberg has none because AD never raised $500,000 in capital while Lindenberg was employed. The Court is not convinced that early termination extinguishes Defendants' liability for earned, accrued compensation, if the funds are subsequently raised, which may have occurred here. Lindenberg's three-year contract provided that "compensation shall be accrued but not paid until the Company has received net cash proceeds . . . in the amount of not less than Five Hundred Thousand Dollars[.]" (Linn Aff. Ex. F § 3.03.) [3] The contract further provided that it "shall be automatically extended for an amount of time equal to any period in which any salaries are deferred." (*Id.* Art. I.) Even in the event of termination for cause, the agreement stated that: "Executive will be entitled to receive her Base compensation and accrued but unpaid benefits . . . earned by Executive pursuant to this Agreement . . . through the Termination Date[.]" (*Id.* § 5.05(c).)

The record before the Court contains conflicting information concerning the amount of cash proceeds that AD ultimately raised. (*Compare* Linn Dep. 163:6-9 (AD raised $500,000 in capital), *and* Scott Dep. 16:19-23 (AD raised $450,000).) Because a disputed issue of material fact exists, and because the record concerning the underlying transaction is incomplete, the parties' motions for summary judgment on Lindenberg's breach of contract claim will be denied.

### D. Breach of the Implied Covenant of Good Faith and Fair Dealing

The parties agree that Nevada law governs the employment agreement, pursuant to a choice of law provision. Under Nevada law, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and execution." *A.C. Shaw Constr. v. Washoe Cnty.*, 784

---

[3] Lindenberg attempts to argue that AD waived this condition because she received partial payments of her salary before any proceeds were raised. This does not constitute waiver, especially where the employment agreement contains an anti-waiver provision stating that "[n]o waiver by either party hereto at any time of any breach . . . or compliance with, any condition or provision of this Agreement . . . shall be deemed a continuing waiver . . . ." (Linn Aff. Ex. F § 9.03.)

P.2d 9, 9 (Nev. 1989) (quoting Restatement (Second) of Contracts § 205).  In support of her breach

of implied covenant claim Plaintiff essentially re-alleges that Defendants failed to comply with the

terms of her employment agreement.  However, noncompliance with contractual terms is not

actionable in a cause of action for breach of the implied covenant.  To the contrary, relief for breach

of the implied covenant of good faith and fair dealing is available where "the terms of a contract

are literally complied with" but one party performs its obligations in a manner that "deliberately

countervenes [sic] the intention and spirit of the contract[.]"  *Hilton Hotels Corp. v. Butch Lewis*

*Prods., Inc.*, 808 P.2d 919, 922-23 (Nev. 1991).  Since Defendants allegedly did not perform at

all, relief is only available in a cause of action for breach of contract.  Accordingly, summary

judgment will be granted in favor of Defendants.

### E.  Economic Duress and Intentional Infliction of Emotional Distress

In their moving brief for summary judgment, Defendants erroneously asserted that

Plaintiff's remaining claims for economic duress and intentional infliction of emotional distress

were dismissed pursuant to the Court's August 6, 2014, Order on motions to dismiss filed by AC

and John Howell.[4]  That Order, however, does not apply to Defendants AD, Avant Diagnostics,

Steven Scott, and Gregg Linn, who did not seek any relief at that time.  The Court will nevertheless

grant summary judgment in favor of Defendants on the aforementioned claims because Plaintiff

did not object and only addressed the first three claims in her opposition brief, thereby abandoning

her causes of action for economic duress and intentional infliction of emotional distress.  *Desyatnik*

*v. Atlantic Casting & Eng'g Corp.,* No. 03-cv-5441, 2006 WL 120163, at * 1 (D.N.J. Jan. 17,

2006) (quoting *Curtis v. Treloar,* No. 96-cv-1239, 1998 WL 1110448 (D.N.J. Aug, 27, 1998)

---

[4] Plaintiff also brought a claim for tortious interference with contract.  However, as that claim was filed against AC
only, it is not applicable to the remaining Defendants.

("when a party fails 'to offer any argument or evidence . . . in opposition to defendants' motion for summary judgement [sic], such claims may be deemed to have been abandoned[.]'")); *see also Nat'l R.R. Passenger Corp. v. Pa. Pub. Util. Com'n*, 342 F.3d 242 n.14 (3d Cir. 2003).  Were the Court to reach the merits, summary judgment would still be warranted in favor of Defendants for the reasons noted in the August 6, 2014 Opinion.

### F.  Defendants' Counterclaims for Breach of Contract

AD counterclaims for two counts of breach of contract, with the second sounding in breach of fiduciary duty, in short, alleging that Lindenberg attempted to defraud the company by transferring AD's intellectual property to Yarra for allegedly worthless compensation in Yarra stock, and that Lindenberg's undertakings in furtherance of Yarra violated, among other provisions, the non-compete clause of Plaintiff's employment agreement.  Plaintiff moves for summary judgment on these counterclaims.  Lindenberg's motion for summary judgment will be denied in light of the insufficiently developed record concerning the Yarra transaction.

However, to the extent that Lindenberg demands to be indemnified for expenses associated with the defense of the counterclaims, AD is correct that the request fails because Plaintiff did not seek recovery on that basis in her pleadings.  "At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with [Federal Rule of Civil Procedure] 15(a)." *Bell v. City of Philadelphia,* 275 F. App'x 157, 160 (3d Cir. 2008) (quoting *Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312, 1315 (11th Cir.2004)).  The Court will not address causes of action raised for the first time in Plaintiff's brief.

### III.  CONCLUSION

For the foregoing reasons, the Court will deny in part and grant in part Defendants' motion for summary judgment.  The Court will grant Defendants' motion for summary judgment on counts

three, four, and five of Plaintiff's Complaint for breach of the implied covenant of good faith and

fair dealing, economic duress, and intentional infliction of emotional distress, respectively.  The

Court will also grant the motion for summary judgment in favor of individual Defendants Steven

Scott and Gregg Linn on count two of Plaintiff's Complaint for breach of contract.  The Court will

otherwise deny Defendants' motion for summary judgment, and also deny Plaintiff's cross-motion

for summary judgment.  An appropriate Order will be filed.

     s/ Stanley R. Chesler     
STANLEY R. CHESLER
United States District Judge

Dated:  February 18, 2016